**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JUDAH D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 19 C 7439** |
| **v.** | ) | |
| | ) | **Magistrate Judge Gabriel A. Fuentes** |
| **KILOLO KIJAKAZI, Acting** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Judah D.[3] was born on April 8, 1954 and applied for Disability Insurance Benefits

("DIB") on October 13, 2016, alleging that he had been disabled since June 1, 2016 because of

fibromyalgia, Lyme disease, diabetes, and sleep apnea. (R. 75-76.) On Plaintiff's application for

DIB, he explained that he stopped working as a computer programmer in 2009 because his father

---

[1] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On December 3, 2019, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to a United States Magistrate Judge for all proceedings, including entry of final judgment. (D.E. 8.)

[3] The Court in this opinion is referring to Plaintiff by his first name and first initial of his last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id*. A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id*., citing *Doe v. Blue Cross & Blue Shield United of Wis*., 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court is abiding by IOP 22 subject to the Court's concerns as stated.

was sick. (R. 176, 196-7, 215.) He returned to work at a call center in 2014, but as of June 1, 2016 (his alleged onset date, or "AOD") he contends his impairments prevented him from working. (*Id.*) Plaintiff's date last insured was December 31, 2019. (R. 223.) After a hearing on November 8, 2018, an administrative law judge ("ALJ") denied Plaintiff's application on December 11, 2018. The Appeals Council declined to assume jurisdiction, making the ALJ's decision the final decision in this case. (R. 1-6.) *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021). Before the Court are Plaintiff's memorandum seeking remand of that decision (D.E. 12) and the Commissioner's motion to affirm. (D.E. 19.)

## I. ADMINISTRATIVE RECORD

### A. Medical Evidence

Between 2012 and 2014 Plaintiff visited ENT Alex Kim, M.D., for treatment of sleep apnea, chronic congestion, facial pain, and headaches related to allergies. (R. 276.) After nasal surgery in July 2014, most of Plaintiff's symptoms improved and he ceased treatment with Dr. Kim. (R. 277.) Beginning in February 2015, Plaintiff began treatment with an endocrinologist for diabetes and related peripheral neuropathy. (R. 311-14.) Treatment notes from August 2015 report that Plaintiff was feeling good; in March 2016 he reported problems sleeping because of his CPAP. On October 10, 2016 Plaintiff complained of pain and discomfort in his legs and told a neurologist/sleep specialist that he had never taken the Lyrica he was prescribed for neuropathy; he was directed to begin taking Lyrica and another medication called Metanx. (R. 322-24.)

In November 2016, Plaintiff began to treat with family doctor Casey Kelley, M.D., for pain, fatigue, gastrointestinal dysfunction, and suspected Lyme Disease. Lab testing for Lyme was negative but bloodwork showed irregular immune numbers and he met other criteria for Lyme, which he likely contracted in his 20's. (R. 327, 335-37.) Dr. Kelley recommended that Plaintiff

continue taking Lyrica, which he reported helped his symptoms, and added Naltrexone for additional pain relief and Saccromycin for his GI symptoms. (*Id.*) Plaintiff was also to continue using his CPAP machine. (*Id.*)

On January 31, 2017, Plaintiff underwent a consultative examination in connection with his claim for benefits, telling the examiner that he had a history of obstructive sleep apnea, diabetes, and recently diagnosed fibromyalgia, and that he had had pain all over and extreme fatigue for many years. (R. 341-344.) Roopa Karri, M.D., noted that Plaintiff was crying, anxious, and emotional during the examination. (R. 342.) Plaintiff's range of motion was normal, he was able to get on and off the examination table and walk 50 feet without assistance and he exhibited no tender points suggestive of fibromyalgia; he reported that his medications helped his pain but that he still got exhausted easily. (R. 343-44.) Plaintiff had decreased sensation to pinprick in both legs from diabetic neuropathy and a positive Romberg (balance) test. (*Id.*)

In February 2017 Plaintiff had a follow up appointment with Dr. Kelley. (R. 351.) His chief complaints were muscle weakness, muscle failure, and muscle pain. (*Id.*) He reported feeling better after starting thyroid medication and antibiotics for his Lyme disease but also complained of radiating pain that got worse after exertion. (R. 352.) His lung capacity and breathing were normal. (R. 354.) Dr. Kelly continued Plaintiff on a low dose of Naltrexone for pain and Lyrica and Advil to help him sleep as well as several antibiotics, and a thyroid medication. (R. 355.) In March 2017 bloodwork confirmed diagnoses of both Lyme disease and Babesiosis, which is a co-infection to Lyme disease that interferes with oxygenation of red blood cells and can cause shortness of breath. (R. 378, 382.) Dr. Kelly continued Plaintiff's medication regimen after he reported fluctuating symptoms of pain and fatigue and added another antibiotic and anti-fungal medication to treat his Lyme disease. (R. 358.) Plaintiff also had a follow-up appointment with his endocrinologist that

3

month at which he complained of fatigue and trouble sleeping; his diabetes foot sensation examination was normal. (R. 397.)

In May, Plaintiff reported to a nurse practitioner that his muscle weakness and fatigue were better than before but still causing discomfort; he now had periods without pain. (R. 364.) He also reported sleeping better and that his overall energy level and ability to think was better. (R. 365.) Also in May 2017, ENT Alex Kim wrote a letter regarding his treatment of Plaintiff. (R. 385.) Dr. Kim described Plaintiff's 2014 nasal surgery and Plaintiff's report that he had been doing very well until six months earlier, when his breathing became difficult again. (*Id.*) Dr. Kim noted that Plaintiff was not taking allergy shots anymore; the doctor changed Plaintiff's allergy and nasal medication regimen, which he reported greatly improved his symptoms. (*Id.*) At an August 12, 2017 follow-up appointment with Dr. Kelley, Plaintiff complained that his energy level and muscle fatigue were worse again, but his brain fog had improved. (R. 443-44.) Two weeks later, on August 30, Plaintiff reported that a change in his antibiotics had improved his muscle pain and brain fog but that his energy level remained low and he was "very fatigued." (R. 464.)[4]

At an appointment with Dr. Kelley's nurse practitioner in March 2018 Plaintiff continued to allege pain, brain fog, and fatigue and reported that his symptoms fluctuated. (R. 472.) He reported being so exhausted that he was unable to fold laundry or vacuum. (R. 473.) In May 2018 Plaintiff had a follow-up appointment with Dr. Kim and reported that after restarting allergy shots and Flonase the previous year his symptoms of congestion and itching had improved. (R. 562.) Dr. Kim continued Plaintiff on a regimen of allergy shots and several allergy medications. (*Id.*) In July

---

[4] The medical record also contains treatment notes from Marcel Hoffman, M.D., who is apparently an internist Plaintiff saw for general physical checkups and mostly acute issues from June 2016 to May 2018 (R. 586- 630.) Dr. Hoffman prescribed Plaintiff's Lyrica for his fibromyalgia and discussed changes to his CPAP settings and the need to exercise at some appointments; he referred Plaintiff to an endocrinologist in 2016 and a pulmonologist in May 2018. (*Id.*)

he reported to the pulmonologist that his breathing due to Babesiosis had not improved despite taking antibiotics; his pulmonary function test was characterized as "supranormal." (R. 569.)

In August 2018 Plaintiff reported during an examination with a nutritionist affiliated with Dr. Kelley's office that he had experienced noticeable improvement with his fatigue, body pain and breathing problems, even though he still had difficulties with all of these issues, particularly exhaustion after doing household chores. (R. 401, 403.) Results of bloodwork showed improvement in thyroid antibodies and that his mold levels were elevated, which suggested he was living in a home with mold. (R. 523.)

The record contains a number of medical opinions. On February 24, 2017, Linda Lanier, Ph.D, opined that Plaintiff did not have a medically determinable mental impairment. (R. 79.) She noted that the medical record showed no evidence of past or current psychiatric treatment, and other than a single notation that Plaintiff had been prescribed valium in 2015, there was no history of psychiatric medication. (*Id.*) Dr. Lanier acknowledged that the consultative examiner had noted that Plaintiff was anxious and emotional but otherwise oriented to time and place and cooperated well during the examination. (R. 80.) On March 8, 2017, James LaFata, M.D., reviewed the medical evidence and Plaintiff's allegation of loss of sensation and opined that Plaintiff had an RFC to perform light work, including frequently lifting up to ten pounds and occasionally lifting up to 20, and sitting, standing, and/or walking for six hours in an eight-hour workday. (R. 82.) He also opined the Plaintiff could perform his past work as a software engineer. (R. 84.) Dr. LaFata based his RFC on medical records from May 2015, October 2016, and January 2017 that revealed some decreased sensation and a positive Romberg test but normal gait, grip strength, ability to perform fine and gross manipulation, lack of fibromyalgia tender points and no current diagnosis of Lyme disease. (R. 82-83.) These opinions were upheld on reconsideration without Plaintiff

having alleged any changes in his physical condition. (R. 87-93.) The doctor who reconsidered Plaintiff's case reviewed additional medical records, including those from Dr. Kelley in March and May 2017, and noted that they showed improvement in Plaintiff's pain and limitations. (R. 97.)

The record contains another opinion by Dr. Rani Phanourath from January 2018, although the last records it references are from May 2017. (R. 389.) It also opines that Plaintiff had a physical RFC of light work and no mental health limitations. (*Id.*) This opinion explained that the medical record showed that Plaintiff's diabetes was stable even without medication, that his sleep apnea showed good response to the CPAP, and that his history of pain and weakness due to Lyme disease had shown improvement as of May 2017, although Plaintiff still reported body pain and sore muscles. (*Id.*) There was no diagnosis of any mental health issue and Plaintiff was not medicated for one, although the opinion acknowledged that he complained of difficulties focusing when reading and trouble thinking. (*Id.*) The opinion was upheld on reconsideration on January 24, 2018 by Tom Dees, M.D. (physical) and January 25, 2018 by Julian Lev, Ph.D (mental) (R. 387, 388.)

Dr. Kelley completed an RFC opinion on May 26, 2018, explaining that she had treated Plaintiff every one-to-three months for the past 18 months and that his prognosis was unknown because his symptoms would flare with an unpredictable pattern. (R. 391.) She described Plaintiff's symptoms as including chronic fatigue, air hunger that required him to focus on breathing during conversation, migrating muscle and joint pain, and poor cognitive function and forgetfulness, among others. (*Id.*) Dr. Kelley wrote that Plaintiff's impairments and limitations began in November 2009 and she checked the box that his pain would "constantly" interfere with the attention and concentration needed to perform simple work. (*Id.*) She opined that Plaintiff

would have to lie down or recline for more than three hours at one time before needing to sit up, stand up, or walk around, that he would need to lie down or recline for 8 hours during an 8-hour workday, and could occasionally lift up to five pounds and rarely carry up to five pounds. (R. 392-93.) With respect to Plaintiff's ability to sit, stand, or walk at one time before needing to change positions, Dr. Kelley opined that Plaintiff could only remain in one position for "0-5" minutes before having to change (*i.e.,* sit from standing, lie down from sitting), that he could stand for a total of less than one hour in an eight-hour workday, that he would have to take unscheduled breaks "75 times daily," and that he would be unable to complete a full work day 5 or more days every month. (*Id.*, 394.)

### B. Hearing

At the hearing on November 8, 2018, Plaintiff testified that he had worked as a software engineer and then as a supervisor of other computer programmers. (R. 36-37.) Plaintiff worked primarily with three computer programs that he testified were no longer in use, each becoming obsolete 10 to 15 years earlier. (*Id.*) His job ended in 2010 when his position was eliminated as part of a merger and restructuring. (R. 39.)[5] Plaintiff then worked briefly as a massage therapist and at an auto manufacturing factory and in 2015 and 2016 worked part-time at a call center. (R. 31.) At the time of the hearing, Plaintiff was working approximately 10 hours per week driving patients to and from physical therapy appointments. (R. 43.)

With respect to his previous job as a computer programmer, Plaintiff testified that he could not go back to that type of job because he was no longer able to perform the analytical thought processes required. (R. 43-44.) In addition, Plaintiff testified, he had not even been able to perform

---

[5] Plaintiff does not reconcile his testimony that he stopped work as a computer programmer because of restructuring at his company with his function report, which says he stopped working because his father was sick, but the Court infers that at some point after Plaintiff stopped working in 2009, his position was eliminated.

the "mediocre thought process" required to work at the call center because he was not able to follow his script and respond appropriately to questions given by the people he called. (R. 44, 45.) With respect to his physical difficulties, Plaintiff testified that it was extremely painful for him to sit for more than a minute or two at a time and that after that his back and legs hurt the most, but the pain was generally body-wide. (R. 46.) He described it as "traveling pain" related to his central nervous system and compared it to being in a fight or the feeling someone might have after running a marathon and being exhausted and in pain throughout their body. (R. 46-47.) Plaintiff further testified that since 2008 or 2009 he experienced pain at a level of 8 to 10 for 24 hours a day and that sitting, walking, and standing made it worse so he constantly had to shift his position. (R. 48-49.) He estimated being able to walk or stand or sit for a couple of minutes before being in pain and that although he might be able to push himself to sit or walk for longer, it would be exhausting and painful. (*Id.*)

With respect to his medical treatment, Plaintiff testified that Dr. Kelley was the most familiar with his impairments; she prescribed a number of medications for his Lyme disease and a medication called Malarone for his babesiosis, which Plaintiff described as "very helpful." (R. 49-50.) Plaintiff testified that a "good day" for him would be to work driving his van for 3 to 3 ½ hours and then spending the rest of the day recuperating by lying on a reclining couch at home; he stated that he did better on the days he worked than on the days he did not. (R. 54.) He had trouble dressing and washing himself from the waist down because of difficulty bending. He occasionally could grocery shop for a few items or do laundry or vacuum, but all of these activities were difficult and left him exhausted. (R. 58-59.) With respect to his babesiosis, Plaintiff testified that it "comes and goes" and when it was bad it caused "air hunger," which was the feeling that no matter how much he breathed, he was not getting enough oxygen." (R. 63.)

8

A vocational expert ("VE") also testified at the hearing. He classified Plaintiff's former computer programming jobs as skilled and sedentary as listed and as actually performed, but that they could include light work when travel was involved. (R. 65.) Upon questioning from the ALJ, the VE testified that if Plaintiff could perform light work and did not have any medically determinable mental health impairments, he would be able to perform his past work as a computer programmer. (R. 66.) When the ALJ added certain postural limitations such as occasional stooping, crouching, crawling, kneeling, and balancing and occasional ramps and stairs but no scaffolds or ladders, Plaintiff would still be able to perform his previous work. (R. 66-67.) Next, the ALJ asked the VE about transferable skills from Plaintiff's previous job, specifically as related to someone closely approaching retirement age, as Plaintiff was, and given regulation 20 CFR 404.1568(d)(4), which said that "unless the skills can be transferred to the tools, processes and industry of the other work with very little, if any, adjustment, there is no transferability." (R. 67.) Given that standard, the VE testified that because Plaintiff had last worked as a computer programmer in 2010, his skills were likely obsolete and thus not transferable. (R. 67-68.) Next, the VE testified that Plaintiff's work as a driver was semi-skilled and light as performed, and the call-center job was semi-skilled and sedentary. (R. 69.)

### C. ALJ Opinion

In his opinion, the ALJ first noted that Plaintiff worked at several jobs during the claims period, but none of them rose to the level of substantial gainful activity ("SGA"). (R. 15-16.) The ALJ then undertook the five-step process for evaluating disability. 20 C.F.R. 404.1520(b). At step two he determined that Plaintiff had the severe impairments of fibromyalgia, sleep apnea, diabetic neuropathy, Lyme disease, Babesiosis, Level II obesity, and allergies with status post septoplasty, and the non-severe impairments of hypothyroidism and sciatica. (R. 16). The ALJ also

acknowledged that Plaintiff alleged a cognitive disorder and "brain fog," but declined to find any medically determinable impairment, explaining that a neurological exam was normal and there was no evidence in the record of diagnosis for or treatment of a cognitive disorder. (*Id.*) Moreover, Plaintiff performed two completely different, semi-skilled jobs after his onset date that were inconsistent with the simple work one would associate with an impaired ability to understand, remember and apply information. (*Id.*)

After determining that Plaintiff did not meet a listing,[6] the ALJ assigned him an RFC for light work except that he could perform only occasional stooping, crouching, crawling, kneeling and balancing and occasional climbing of ramps and stairs but no climbing of ladders, ropes, or scaffolds. (R. 17.) He could perform no work at unprotected heights or use heavy equipment and could not be around concentrations of dust, fumes, odors, or temperature extremes. (*Id.*)

In support of his RFC determination, the ALJ first summarized Plaintiff's allegations, including that he experienced extreme pain, fatigue and muscle weakness as well as an inability to exert any sustained physical or mental effort. (R. 18.) Specifically, the ALJ noted that Plaintiff reported having difficulty with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, using his hands, remembering, understanding, following instructions, getting along with others, completing tasks, talking, hearing, and seeing, and that the dysfunction of his nervous system caused body-wide pain after a few minutes of sitting, standing, or walking so he had to constantly shift positions. (*Id.*) The ALJ noted that Plaintiff testified his symptoms had been severe since 2008 or 2009, which was why he stopped working as a computer

---

[6] The ALJ noted that no listing exists for fibromyalgia but stated that he considered whether Plaintiff's symptoms from fibromyalgia were similar to other listed impairments and concluded that in this case, they were not. (R. 17.) With respect to Plaintiff's obesity, the ALJ noted that the combined effects of obesity with other impairments can be greater than the effects of each impairment considered separately, and that he had considered whether Plaintiff's obesity affected his other impairments at every step of the sequential evaluation process. (*Id.*)

programmer, and that he was unable to return to that kind of work because he was unable to manage the complex thought process required. (*Id.*) After describing Plaintiff's allegations, the ALJ explained that he found them to be "not entirely consistent with the medical evidence." (R. 18.)

The ALJ acknowledged that Dr. Hoffman, a primary care physician, diagnosed Plaintiff with peripheral neuropathy related to diabetes - although with normal gait, balance, and coordination and without taking prescribed Lyrica - as well as obstructive sleep apnea; given these two diagnoses the ALJ stated that Plaintiff could not work around unprotected heights, heavy equipment, heavy machinery or hazards. (R. 18-19.) The ALJ next explained that the results of a May 2018 spirometry (pulmonary function test) which measured Plaintiff's lung capacity at 117% and forced expiratory volume at over 136%, as well as 111% of the oxygen diffusing capacity were not consistent with asthma, COPD, or Dr. Kelley's assessment of Babesiosis. (*Id.*) Plaintiff's normal red blood cell count in October 2016 was also inconsistent with alleged impaired blood oxygenation. (R. 19.)  Instead, the ALJ noted various evidence in the record about Plaintiff's treatment for severe congestion due to allergies, his status post septoplasty, and his sleep apnea, and suggested these were the likely causes of Plaintiff's alleged "air hunger," and thus the ALJ assigned environmental precautions in his RFC. (*Id.*)

The ALJ noted that although he was crying and emotional during his consultative examination, Plaintiff's examination, including a review of all systems, was otherwise essentially normal in January 2017, including negative straight leg raising test, normal range of motion in his spine, normal cranial nerves, normal reflexes, and normal strength. (*Id.*) The ALJ acknowledged Plaintiff's positive Romberg test and decreased pinprick sensation in his legs but highlighted the fact that he exhibited no tender points. (*Id.*)

In discussing Dr. Kelley's treatment notes, the ALJ first noted that she is a family practitioner with a stated specialty in Lyme disease who diagnosed Plaintiff's Lyme, Babesiosis and fibromyalgia. (R. 20.) The ALJ explained that the six criteria under SSR 12-2p for establishing fibromyalgia were only marginally present, but Dr. Kelley did document 11/18 tender points on at least two occasions, although she did not consider alternative causes for the symptoms as the regulations require. (*Id.*) However, the ALJ acknowledged that Dr. Kelley was a physician who had examined the Plaintiff. (*Id.*) With respect to Plaintiff's Lyme diagnosis the ALJ noted that Plaintiff's symptoms mostly resolved with antibiotics, and that in June 2018 he denied myalgias or arthralgias, had no easy bruising and stated he was able to breathe. (*Id.*) Moreover, while Plaintiff was treated from January to September 2018 at Northwest Community Healthcare for various illnesses and sporadic complaints of shortness of breath with fever, cough and congestion, objective findings regarding Plaintiff's impairments remained relatively unremarkable. (*Id.*)

With respect to Plaintiff's credibility about the severity of his symptoms, the ALJ noted that although he testified at the hearing that he stopped working due to the severity of his symptoms, Plaintiff reported in his disability application that he stopped working because his father was ill and that he was no longer able to work when he returned. (*Id.*) This suggests, says the ALJ, that Plaintiff's AOD may have been an artificial date unrelated to medically determinable impairments and that Plaintiff may have actually stopped working for other than medical reasons. (*Id.*) Next, the ALJ found Plaintiff's credibility about his breathing difficulties were eroded by the fact that after he underwent a septoplasty in July 2014, he recovered with symptom improvement and did not return to his ENT until 2017, at which time he told Dr. Kim he was doing well. (*Id.*) Further, Plaintiff's recent complaints of breathing difficulties coincided with his admission that he had stopped taking his allergy shots; the ALJ found Plaintiff's non-compliance with treatment as

well as his admission that the medication he took for Babesiosis was "very helpful" to also undermine his credibility about the severity of his symptoms. (*Id.*) Finally, the ALJ noted that Plaintiff had been able to travel to St. Louis with his daughter, driving for an hour and then sitting as a passenger for six to seven hours. (*Id.*) The ALJ discussed Plaintiff's daily activities, including his testimony about working part-time as a van driver, watching television, and listening to audiobooks, information he gave in his 2017 function report that he was able to drive, prepare meals, shop in stores, handle his finances, read and spend time with his wife, and reports during an August 2018 medical examination that despite his fatigue and exhaustion his symptoms had improved enough that he could now do household chores such as folding the laundry and vacuuming. (R. 21.)

The ALJ gave significant weight to the state agency medical opinion that found Plaintiff able to perform a reduced range of light work and the separate opinion that Plaintiff did not have a medically determinable mental impairment. (*Id.*) Specifically, the ALJ noted that three other state agency consultants concurred with these findings, and that these doctors were knowledgeable about SSA regulations. (*Id.*) The mental health opinion was consistent with treatment records that show a complete absence of treatment for or documentation of any cognitive disorder and the physical health opinion was consistent with Plaintiff's work activity and the findings of the internal medicine consultative examiner. (*Id.*)

The ALJ acknowledged the treating physician rule before explaining why he considered Dr. Kelley's opinion but gave it no weight. (R. 21.) The ALJ stated that Dr. Kelley's conclusions were not well-supported and were materially inconsistent with other substantial evidence. Additionally, the ALJ stated that over the two years Plaintiff treated with Dr. Kelley, there were several "gaps in treatment" including from November 2016 to January 2017, no treatment in April

2017, and no treatment from June 2017 to July 2017. (R. 22.) Moreover, the ALJ additionally found Dr. Kelley's opinion deserving of little weight because at some appointments, Plaintiff met with a nurse practitioner instead of the doctor, and also because the opinion was "not consistent with the objective findings of the claimant's internal medicine consultation examination, which did not reflect the claimant as so limited." (*Id.*) Finally, the ALJ found Dr. Kelley's opinion unreconcilable with the work Plaintiff performed after his AOD or the personal trip to St. Louis Plaintiff took with his daughter to visit law schools. (*Id.*)

The ALJ found Plaintiff able to perform his past work as a computer programmer, which did not require any activities beyond the RFC that the ALJ assigned. (*Id.*) "Past relevant work," explained the ALJ, must have been performed within the last 15 years and have lasted long enough for the claimant to have learned to do the job. The ALJ found that both of these factors were met and that the VE testified that Plaintiff could perform his past job as actually performed, but could no longer do the job as currently performed because his skills are obsolete. (R. 23.) Therefore, Plaintiff was not disabled.

## II. LEGAL STANDARD

An ALJ's decision will be affirmed if it is supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, -- U.S. --, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. The Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination. Rather, this court asks whether the ALJ's decision reflects an adequate logical bridge from the evidence to the conclusions." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (internal citations and quotations omitted).

### III. ANALYSIS

In arguing for summary judgment, Plaintiff contends that the (1) the ALJ's RFC determination was not supported by substantial evidence; (2) the ALJ improperly failed to consider Plaintiff's limitations in concentration, persistence, and pace; (3) the ALJ erred by not giving Dr. Kelley's opinion controlling weight; and (4) the ALJ's Step 4 finding that Plaintiff could perform his past work was erroneous. We will address each issue in turn.

### A. The ALJ's RFC Is Supported By Substantial Evidence.

The ALJ found that the medical record supported a number of Plaintiff's different physical impairments but that he was nevertheless able to work at the light level with certain postural limitations. While Plaintiff contends that the medical record and his subjective testimony both fail to support the ALJ's decision, we find that the ALJ adequately addressed the evidence in making his determination. That is, after acknowledging Plaintiff's testimony, complaints to his doctors, examination results and medical tests, the ALJ pointed to evidence of normal medical examinations (as well as those that were abnormal), Plaintiff's positive response to medication to treat his symptoms and his reports of improvement, and, most importantly, the opinions of three consultative doctors that Plaintiff was able to work at the light level as well as three others who concluded Plaintiff has no mental impairment. Plaintiff does not point to evidence that the ALJ ignored or otherwise did not address but argues instead that "there is substantial evidence to support a finding that Plaintiff would be unable to perform even sedentary work." Pl. Mem. in Support of Sum. J. at 7. But this argument is nothing more than Plaintiff's contention that the ALJ mis-weighed the evidence, and it is not the Court's place to reweigh evidence. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (The reviewing court may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility

determinations." Even when reasonable minds could disagree, if the ALJ supported her finding with substantial evidence, there is no basis for remand. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).

In deciding if the ALJ's determination is supported by substantial evidence we must look at the effect Plaintiff's impairments have on his ability to work as a whole, even if an individual impairment might not be disabling on its own. SSR 96-5p; 20 C.F.R. § 404.1545. To this end, Plaintiff contends that the ALJ failed to properly consider the effects of his fibromyalgia, Babesiosis, and obesity on his ability to work. Pl. Mem. in Support of Sum. J. at 9. We disagree. As an initial matter, the ALJ carefully analyzed the evidence regarding Plaintiff's breathing issues, including evidence related both to his Babesiosis as well as his allergies and sleep apnea, before concluding that Plaintiff's shortness of breath did not preclude him from performing light work. Among the evidence the ALJ considered was the fact that Plaintiff's pulmonary function tests were normal (or even supranormal), his testimony that the medications he took for Babesiosis worked "very well", and evidence that Plaintiff's allergies and congestion worsened when he failed to take his allergy shots. Plaintiff points to no evidence to support his contention that his Babesiosis diagnosis caused him to be unable to perform light work and we find the ALJ's analysis is supported by substantial evidence. With respect to Plaintiff's obesity, the ALJ acknowledged it and accepted the opinions of three consultative doctors who had reviewed the medical record, including noting his BMI, and found that Plaintiff was able to perform light work. *See, Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (ALJ adequately addressed Plaintiff's obesity by adopting limitations suggested by reviewing doctors, who were aware of Plaintiff's BMI.)

Fibromyalgia is difficult to diagnose. As the Seventh Circuit has observed, fibromyalgia is a "common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which

it shares a number of features." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996), *cited in Michael N. v. Saul*, No. 18 CV 5424, 2021 WL 1172743, at *5 (N.D. Ill. Mar. 29, 2021) (explaining that *Sarchet* discussed the challenge of diagnosing fibromyalgia and the unavailability of objective tests other than assessing tender points.)  In this case, the medical evidence includes a diagnosis of Plaintiff's fibromyalgia (apparently from Dr. Kelley's finding of 11/18 tender points on two occasions), a diagnosis the ALJ accepts.

But as Defendant argues, "diagnosis is not the same as disability," and it is up to the Plaintiff to show how his fibromyalgia impacted his ability to work to the point of making him totally disabled. *Heather M. v. Berryhill*, 384 F. Supp. 3d 928, 937 (N.D. Ill. Jun. 5, 2019). *See also, Kolar v. Berryhill,* 695 F.App'x 161, 162 (7th Cir. 2017) (Recognizing that fibromyalgia "can have a wide range of effects" and thus an ALJ's determination "may be inconsistent with some evidence in the record and consistent with other evidence."). Plaintiff points only to his own testimony and Dr. Kelley's opinion (which the ALJ gave no weight) to support his allegations that his fibromyalgia was disabling.  In contrast, the ALJ pointed out normal examination findings, improvement with medication, and Plaintiff's participation in various ADLs to support his determination that Plaintiff was not disabled by any of his impairments, including his fibromyalgia. (doc. #5: Def. Mem. in Support of Sum. J. at 5).  Moreover, as we explain below, the ALJ found Plaintiff's allegations about the severity of his symptoms - including those related to his fibromyalgia - to be not entirely credible. Therefore, we find that the ALJ supported his entire RFC determination with substantial evidence.

### B. The ALJ's Credibility Analysis Was Not Patently Wrong.

The ALJ supported with substantial evidence his finding that Plaintiff's allegations about his symptoms were not entirely credible. To determine the credibility of allegations of disabling

symptoms, an ALJ may consider factors including objective medical evidence, daily activities, and any inconsistencies between the allegations and the record. 20 C.F.R. § 404.1529(c).  As long as an ALJ gives specific reasons supported by the record, we will not overturn a credibility determination unless it is patently wrong.  *Grotts v. Kijakazi*, 27 F.4th 1273, 1279 (7th Cir. 2022).

In this case, the ALJ gave a number of reasons for doubting the severity of Plaintiff's symptoms and his contention that he was totally disabled. Specifically, the ALJ found that Plaintiff's allegations were eroded by 1) his testimony and a function report in which he variously reported being able to drive a van ten hours a week, drive to St. Louis to take his daughter to visit law schools, listen to audiobooks and watch television,[7] shop in stores, spend time with his wife, handle his finances, and prepare meals; 2) an August 2018 examination during which he reported that he could now do some household chores and walk his dog "a little bit," despite his exhaustion; 3) Plaintiff's admission that medication significantly helped his Babesiosis and evidence that his breathing problems were related to his failure to take his allergy shots; and 4) the inconsistencies in Plaintiff's reason(s) for stopping work in 2009.  These are substantial reasons, grounded in the medical record, for the ALJ to discredit Plaintiff's allegations about the severity of his symptoms. Moreover, contrary to Plaintiff's assertion, the ALJ did not equate his ability to perform certain activities of daily living with an ability to work full time, but merely noted that such activities eroded Plaintiff's contention that his symptoms are so severe that he was unable to work at all. *Penrod on behalf of Penrod v. Berryhill*, 900 F.3d 474, 478 (7th Cir. 2018). All of the ALJ's reasoning is supported by record evidence, and thus we find that his credibility determination was not patently wrong.

---

[7] Plaintiff argues that activities such as listening to audiobooks and watching television do not bear on his ability to perform physical tasks.  This may be so, but the ALJ also found not credible Plaintiff's allegations of cognitive disfunction, for which the ability to listen to audiobooks and handle his finances are relevant.

C.    **Substantial Evidence Supports the ALJ's Decision Not To Include Non-Exertional Limitations in the RFC.**

We find that the ALJ's treatment of Plaintiff's alleged cognitive impairment was supported by substantial evidence.  The ALJ considered three medical opinions that found Plaintiff to have no cognitive impairment at all, his normal neurological examinations, an absence of diagnosis or treatment of any cognitive impairment in the record, and Plaintiff's ability to perform semi-skilled jobs as support for his determination that Plaintiff's RFC did not need to include non-exertional limitations on concentration, persistence, and pace.  Plaintiff argues that this result is wrong because there is evidence – in the form of documentation in Dr. Kelley's notes – that Plaintiff had problems with short-term memory and poor cognitive function, as well as a mention by the consultative examining doctor that Plaintiff was emotional and anxious, and the ALJ's witnessing of Plaintiff's cognitive functioning during the hearing.

Again, Plaintiff's allegations to the contrary amount to little more than a disagreement with the ALJ's weighing of the evidence.  Given the absence of any diagnosis of or treatment for a cognitive impairment anywhere in the record, we find that that ALJ's determination was supported by substantial evidence. *Shelia M. v. Saul,* 20 C 664, 2021 WL 1784775 at *4 (N.D. Ill. May 5, 2021) (ALJ did not have to assess Plaintiff's mental functional limitations because he did not find claimant to have a medically determinable mental impairment; acknowledgement of alleged struggles with concentration is not the same as finding medically determinable impairment.)  And as we explain below, the ALJ properly supported his decision to give Dr. Kelley's opinion little weight, including her determination about Plaintiff's cognitive limitations.

D.    **The ALJ Supported With Substantial Evidence His Decision To Give Dr. Kelley's Opinion No Weight.**

The regulations require that for applications filed before March 31, 2017, the ALJ must evaluate "every medical opinion" and assign a treating physician's opinion controlling weight if it

is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c); *see Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018).

An ALJ "must offer good reasons for discounting the opinions of a treating physician." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (internal quotation omitted). In this case, after deciding not to give Dr. Kelley's opinion any weight, the ALJ properly acknowledged his obligation to decide what lesser weight to assign the opinion, taking into account the factors of (1) whether there was an examining or treating relationship; (2) the length, nature, and extent of the treatment relationship; (3) the frequency of examination; (4) the consistency and supportability of the physician's opinion; and (5) the physician's specialty. 20 C.F.R. § 404.1527(c). If the ALJ discounts the physician's opinion after considering these factors, the Court "***must*** allow that decision to stand so long as the ALJ minimally articulated her reasons—a very deferential standard that [the Seventh Circuit has] deemed lax." *Maria M. D. v. Kijakazi*, No. 20 C 3006, 2022 WL 2915643, at *3 (N.D. Ill. July 25, 2022) (internal citations omitted.)

In this case, while some of the ALJ's reasons for discounting Dr. Kelley's opinion are not well-taken,[8] we agree that the ALJ's ultimate conclusion to give the opinion no weight was supported with substantial evidence. After acknowledging that Dr. Kelley had treated Plaintiff for two years and that she "apparently instructs on Lyme disease" but was not an infectious disease doctor, the ALJ concluded that Dr. Kelley's opinion that Plaintiff's symptoms were essentially disabling was inconsistent with the bulk of the evidence, including Plaintiff's own testimony about

---

[8] Specifically, we give no weight to the ALJ's reasoning to discount Dr. Kelley's opinion because of gaps in Plaintiff's treatment or because at some appointments he met with a nurse practitioner instead of the doctor herself. The supposed "gaps" to which the ALJ refers are no more than one-to-three month spans of time between regularly scheduled appointments; there is absolutely no evidence that Plaintiff delayed treatment with Dr. Kelley. Moreover, Plaintiff's treatment with a nurse practitioner in Dr. Kelley's office was, presumably, under the doctor's supervision and control.

the work he performed after his onset date, the six consultative opinions that found Plaintiff had no mental impairments at all and was able to perform light work, and with the consultative examiner who assessed Plaintiff with normal gait, strength and range of motion and no tender points. While Dr. Kelley opined that Plaintiff was so disabled that he would need to lie down for eight hours in an eight-hour workday and could not stand, sit, or walk for more than five minutes at a time, the medical record belied this determination and the ALJ offered substantial evidence for discounting Dr. Kelley's opinion. *Cindy P. v. Kijakazi,* 70 C 6708, 2022 WL 2802328 at *6, (N.D. Ill. July 18, 2022) (ALJ entitled to discount "extreme" opinion of treating doctor as long as she 'minimally articulates' reasons for rejecting evidence of disability.)

### E.     ALJ's Step Four Dismissal Was Not Error.

Finally, we find that the ALJ supported with substantial evidence his decision that Plaintiff was able to perform his previous job as a computer programmer and thus was not disabled. "Past relevant work" includes work that has been performed in the last 15 years. 20 C.F.R. § 404.1565(a). In this case, Plaintiff performed work as a computer programmer until 2009, filed his claim for benefits in 2016, and the ALJ rendered his decision in 2018.

Plaintiff argues that he has shown he is unable to perform his past work – both physically and because his past skills are obsolete – and thus that the ALJ erred by not moving to Step Five of the sequential analysis. But Plaintiff's argument presupposes that he sufficiently demonstrated his inability to perform his previous job as a computer programmer. As we explained above, the ALJ properly found that Plaintiff is able to perform a wide range of light work and also that he did not have any mental impairment. While Plaintiff's particular knowledge about the computer programs he worked on may have been obsolete, the VE testified that Plaintiff would still be able to perform work as a computer programmer as generally performed. *See Barnhart v. Thomas,* 540

U.S. 20, 25, 26 (2003) (At Step Four, it is irrelevant whether Plaintiff's previous work is still available in significant numbers; the only question is whether Plaintiff is still able to perform the job). Therefore, the ALJ did not err in finding at Step Four that Plaintiff was still able to perform his previous job.

**CONCLUSION**

For the foregoing reasons, the Court denies Plaintiff's motion to remand (D.E. 12) and grants the Commissioner's motion to affirm (D.E. 19).


                                        **ENTER:**


                                        **GABRIEL A. FUENTES**
                                        **United States Magistrate Judge**


**DATED: September 13, 2022**